SDD:SPN
F. #2014R01283

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

14 M 732

UNITED STATES OF AMERICA

- against -

LOUAY IBRAHIM HUSSEIN,

▇▇▇▇▇▇▇▇▇▇▇,"

NAZER AL SHEKH MOSA,
MOUAFAK ALSABSABI,
also known as
"Abu Masen,"

▇▇▇▇▇▇▇▇▇▇▇▇▇,

Defendants.

- - - - - - - - - - - - - X

**FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN SUPPORT OF
ARREST WARRANTS

(18 U.S.C. §§ 371, 473 and 2)

EASTERN DISTRICT OF NEW YORK, SS:

JOSEPH GERBINO, being duly sworn, deposes and states that he is a Special Agent with the United States Secret Service, duly appointed according to law and acting as such.

Upon information and belief, in or about and between September 2011 through the present, within the Eastern District of New York and elsewhere, the defendants LOUAY IBRAHIM HUSSEIN; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ NAZER AL SHEKH MOSA; MOUAFAK ALSABSABI, also known as "Abu Masen";

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬, together with others, did knowingly and intentionally conspire to sell, exchange, transfer, and deliver false, forged, and counterfeited obligations of the United States, to wit, counterfeit Federal Reserve notes, with the intent that the same be passed, published, and used as true and genuine, in violation of Title 18, United States Code, Section 473. In furtherance of the conspiracy and to effect its objects, the above-named defendants committed and caused to be committed the overt acts detailed below.

(Title 18, United States Code, Section 371)

Upon information and belief, in or about June 2012, within the extraterritorial jurisdiction of the United States, the defendant LOUAY IBRAHIM HUSSEIN, together with others, did knowingly sell, exchange, transfer, and deliver false, forged, and counterfeited obligations of the United States, to wit: approximately $48,400 in counterfeit Federal Reserve Notes, with the intent that the same be passed, published, and used as true and genuine, in violation of Title 18, United States Code, Section 473.

(Title 18, United States Code, Sections 473 and 2)

Upon information and belief, in or about September 2012, within the extraterritorial jurisdiction of the United States, the defendant LOUAY IBRAHIM HUSSEIN, together with others, did knowingly sell, exchange, transfer, and deliver false, forged, and counterfeited obligations of the United States, to wit, approximately $99,000 in counterfeit Federal Reserve Notes, with the intent that the same be passed, published, and used as true and genuine, in violation of Title 18, United States Code, Section 473.

(Title 18, United States Code, Sections 473 and 2)

3

Upon information and belief, on or about June 25, 2014, defendants LOUAY IBRAHIM HUSSEIN and NAZER AL SHEKH MOSA, together with others, within the extraterritorial jurisdiction of the United States, did knowingly sell, exchange, transfer, and deliver false, forged, and counterfeited obligations of the United States, to wit, approximately $170,000 in counterfeit Federal Reserve Notes, with the intent that the same be passed, published, and used as true and genuine, in violation of Title 18, United States Code, Section 473.

(Title 18, United States Code, Sections 473 and 2)

Upon information and belief, in or about July 2014, within the Eastern District of New York and elsewhere, the defendants LOUAY IBRAHIM HUSSEIN and MOUAFAK ALSABSABI, also known as "Abu Masen," together with others, did knowingly sell, exchange, transfer, and deliver false, forged, and counterfeited obligations of the United States, to wit, approximately $4,000 in counterfeit Federal Reserve Notes, with the intent that the same be passed, published, and used as true and genuine, in violation of Title 18, United States Code, Section 473.

(Title 18, United States Code, Sections 473 and 2)

The source of your deponent's information and the grounds for his belief are as follows:[1]

1.  I have been a Special Agent with the United States Secret Service ("USSS") since 2008. I have participated in numerous investigations involving the

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. Where foreign language conversations are summarized, they are based on draft translations, and are set forth in sum and substance and in part.

production, sale and use of counterfeit United States currency, and I am familiar with the means and methods commonly employed by organizations engaged in criminal activity involving counterfeit United States currency. I have personally participated in the investigation discussed below. I am familiar with the facts and circumstances of this investigation from: (a) my personal participation in the investigation, (b) reports made to me by other law enforcement authorities, and (c) records obtained pursuant to subpoenas and search warrants.

2. The USSS and the Federal Bureau of Investigation ("FBI") are conducting an investigation into a criminal organization operating in Lebanon and elsewhere that is engaged in the production and sale of high-quality counterfeit currency, including counterfeit Federal Reserve Notes ("U.S. currency") and Euro notes, and in the trafficking of narcotics and weapons.

3. In or about September 2012, a Confidential Source ("CS"), who has previously provided reliable information and whose information has been corroborated by other information obtained during the course of the investigation, traveled to Lebanon, where he discussed with █████ ████████████████████████████████ the potential purchase of counterfeit currency, which ████████ stated he could provide. During a meeting in early February 2012, ████████ provided the CS with sample counterfeit bills, including ten sample counterfeit $100 bills and five sample €500 Euro notes. ████████ stated that the bills were priced according to their quality and that his highest quality $100 U.S. bills, for sale for $35 each, would withstand scrutiny by typical authentication pens and machines. ████████ further stated that if the CS wanted to purchase a large quantity of counterfeit currency, ████████ could arrange to send the counterfeit currency to the United States or to another country.

4. In or about and between February 2012 and March 2012, ▮ ▮ introduced LOUAY IBRAHIM HUSSEIN ("HUSSEIN") to the CS as ▮ partner, and stated that HUSSEIN would be directed to complete any transaction on ▮ behalf. The CS had known HUSSEIN for a number of years prior to his work in this investigation.

5. Following the meeting described above, the CS returned to the United States but remained in contact with HUSSEIN over the internet and by telephone. During these communications, HUSSEIN and the CS referred to the counterfeit currency as "chicken," a code they both understood from their prior discussions.

6. During a monitored telephone call on April 23, 2012, the CS asked HUSSEIN whether HUSSEIN could e-mail photographs of sample bills for the CS to review. HUSSEIN requested that the CS send him, via a social media website, the e-mail addresses to which the samples should be sent. The CS did so, providing HUSSEIN with an e-mail address (the "CS E-mail Account") created under the supervision of investigating agents.

7. On April 24, 2012, HUSSEIN sent two e-mails to the CS E-mail Account, attaching images of the front and back of a counterfeit €500 Euro note. Later the same day, using the CS E-mail Account, the CS replied, under the direction of the investigating agents, "i received the pic of euro chicken / i need you to do me your best to send me the pic of the american chicken, the best one you have[.]"

8. On April 25, 2012, HUSSEIN sent two e-mails to the CS E-mail Account, attaching images of the front and back of a counterfeit U.S. $100 bill. The subject heading of the first e-mail was "A C," which the CS understood as an abbreviation for "American chicken."

6

9.  Also in early 2012, the CS introduced a USSS Special Agent working in an undercover capacity (the "UC") to HUSSEIN. The UC communicated with HUSSEIN through consensually monitored telephone conversations, text messages, and e-mails. In June 2012, the UC arranged to purchase $50,000 in counterfeit U.S. currency and €500 in counterfeit Euros from HUSSEIN for approximately $10,500 genuine U.S. dollars.

### The June 2012 Transaction

10.  On or about June 27, 2012, an intermediary (CS2") known to the CS and directed by the UC met with HUSSEIN in Lebanon, where HUSSEIN provided the CS2 with a sealed package that, unbeknownst to CS2, contained $48,400 in counterfeit U.S. currency and €500 in counterfeit Euros. CS2 subsequently delivered the sealed package to the U.S. Embassy in Beirut, Lebanon. In or about and between June 2012 and August 2012, the UC wired HUSSEIN a total of $10,500 genuine U.S. dollars via Western Union from various locations in and around Brooklyn, New York.

### The September 2012 Transaction

11.  Following the June 2012 transaction, HUSSEIN sent the UC an e-mail message indicating that he had access to a new style of counterfeit currency. The UC arranged to purchase approximately $100,000 of the new counterfeit U.S. currency and €154,250 in counterfeit Euros from HUSSEIN for approximately $30,000 genuine U.S. currency. In or about August 30, 2012, the UC wired an initial payment to HUSSEIN via Western Union. On or about September 12, 2012, CS2 met with HUSSEIN in Lebanon, received a sealed package that, unbeknownst to CS2, contained $99,900 in counterfeit U.S. currency, and delivered the sealed package to the U.S. Embassy in Beirut. In or about and between August 2012 and

7

October 2013, the UC wired HUSSEIN a total of approximately $30,000 via Western Union from various locations in and around Brooklyn, New York.

12. On or about November 27, 2012, HUSSEIN stated in consensually monitored conversations with the UC that HUSSEIN was producing $800 million in high-grade counterfeit U.S. currency with support from, and for sale to, clients in Iran, and that HUSSEIN could provide the UC with some of that counterfeit currency for use in the United States.

### The October 2013 Cyprus Operation

13. In or about and between March and September 2013, HUSSEIN introduced the UC to two of his associates, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, during consensually monitored telephone conversations. HUSSEIN stated that he would provide the UC with additional counterfeit currency, and that he could provide narcotics and high-powered weapons, including machine guns, anti-tank, and anti-aircraft weapons, through ▇▇▇ and ▇▇▇ The UC made arrangements with HUSSEIN, ▇▇▇ and ▇▇▇ to purchase an additional $300,000 in counterfeit U.S. currency in exchange for $30,000 genuine U.S. currency.

14. In October 2013, HUSSEIN sent ▇▇▇▇▇▇▇▇▇ and ▇▇▇ ▇▇▇ to meet the UC and the CS in Cyprus. On October 24, 2013, ▇▇▇ and ▇▇▇ met with the UC and the CS at a hotel in Limassol, Cyprus. ▇▇▇ and ▇▇▇ stated that because of a miscommunication with HUSSEIN, they had not realized that they were supposed to arrive with the $300,000 in counterfeit U.S. currency. On October 26, 2013, ▇▇▇ and ▇▇▇ returned to Lebanon to retrieve the counterfeit currency from HUSSEIN, but they did not return to Cyprus.

15. During a series of monitored telephone calls between HUSSEIN and the UC conducted on October 27 and 28, 2013, HUSSEIN stated that he gave ▮▮▮▮ and ▮▮▮▮ the $300,000 in counterfeit U.S. currency but that they were unable to travel with it to Cyprus because the currency was confiscated by a village leader, whose approval was needed before they could leave the country, to satisfy a previous debt owed by HUSSEIN.

### The June 2014 Transaction

16. In or about May 2014, HUSSEIN agreed to meet with the CS and UC in Malaysia to sell them an additional $100,000 in counterfeit U.S. currency and to discuss plans to sell them weapons and narcotics.

17. On June 24, 2014, the UC and CS met with HUSSEIN and an associate of HUSSEIN's, NAZER AL SHEKH MOSA, in Kuala Lumpur, Malaysia, during which meeting HUSSEIN presented the UC and CS with nine counterfeit $100 Federal Reserve Notes for their review.

18. On June 25, 2014, HUSSEIN and NAZER AL SHEKH MOSA sold the UC approximately $170,000 in counterfeit U.S. currency. The UC paid HUSSEIN and MOSA $10,000 in genuine U.S. currency as an initial payment toward a total purchase price of approximately $51,000.

### The July 2014 Transaction

19. On July 7, 2014, HUSSEIN contacted the CS in Brooklyn by phone to request that the UC pay the remainder of the $51,000 owed to HUSSEIN to an associate of HUSSEIN's, MOUAFAK ALSABSABI, also known as "Abu Masen," based in Garden City, New York. ALSABSABI, in turn, agreed to meet with the CS, and told the CS that HUSSEIN

had urged him to provide the UC with an additional sum of counterfeit U.S. currency as a step towards an additional sale of larger quantities of counterfeit currency.

20.     Later on July 7, 2014, the UC and the CS met with ALSABSABI in Garden City, New York, during which meeting ALSABSABI provided $4,000 of counterfeit U.S. currency to the UC in exchange for $1,200 genuine U.S. dollars. ALSABSABI also offered to accept payment of the debt owed to HUSSEIN.[2] Analysis of the counterfeit currency obtained from ALSABSABI indicates that it was produced from the same source as the counterfeit currency purchased from HUSSEIN in Malaysia.

21.     The USSS has determined that the counterfeit U.S. currency provided by HUSSEIN and ALSABSABI is of extremely high quality and comes from the same source as other counterfeit currency that has been identified by law enforcement as originating in Lebanon.

WHEREFORE, your deponent respectfully requests that arrest warrants issue and that the defendants LOUAY IBRAHIM HUSSEIN; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ NAZER AL SHEKH MOSA; MOUAFAK ALSABSABI, also known as "Abu Masen"; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ be dealt with according to law.

It is further requested that this affidavit, arrest warrant, and other papers submitted in support of this application be sealed until further order of the Court so as to prevent notifying the defendants of the pending warrants, which might result in the defendants attempting to avoid capture or destroy evidence. At the time of a defendant's initial

---

[2]     The UC declined to pay off the debt at this meeting.

10

presentment on the warrant, the above-referenced documents shall be partially unsealed as to that defendant to permit disclosure of the documents to defense counsel, but otherwise shall remain under seal until further order of the Court.

                                            JOSEPH GERBINO
                                            Special Agent, United States Secret Service

Sworn to before me this
8 day of August, 2014

THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK